**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **SYDNEY BLUM,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 12-313** |
| | : | |
| **THE UNIVERSITY OF PENNSYLVANIA,** | : | |
| **Defendant.** | : | |

_____ :

**Goldberg, J.**                                                                 **June 18, 2013**

## MEMORANDUM OPINION

This case involves an ongoing dispute between Plaintiff, Sydney Blum, and Defendant, the University of Pennsylvania ("Penn"), which stems from disciplinary proceedings over Blum's alleged violation of Penn's Code of Academic Integrity. The matter was settled on January 23, 2012, but is back before the Court pursuant to Blum's "Motion to Vacate Dismissal and Reinstate the Complaint." For the reasons set forth below, Blum's motion will be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

During the relevant time period, Sydney Blum was an undergraduate student at Penn. Blum suffers from a series of mental and physical disabilities, including attention deficit hyperactivity disorder; severe executive dysfunction; anxiety disorders; a processing disorder; an autonomic nerve disorder; an autoimmune disorder and severe depression. Among other symptoms, Blum has regular disabling and debilitating panic attacks during which she is not able to function normally or process information. (Compl. ¶¶ 9, 11, 14.)

After beginning her studies at Penn, Blum sought assistance from Penn's office of Student Disabilities Services ("SDS"). SDS provided Blum with several forms of assistance,

including test-taking accommodations wherein she was permitted to take exams in a private testing room at the Weingarten Learning Resources Center ("WLRC").  (Id. at ¶¶ 15-16, 19, 22.)

On February 24, 2011, Blum was scheduled to take an examination in her developmental neurobiology course at the WLRC.  On the day of the exam, the WLRC staff placed Blum in a private test-taking room.  At the commencement of the exam, the proctor, Arthur Levy, informed Blum that the WLRC was out of "official" scrap paper, which carried preprinted identifying marks.  The "official" scrap paper with identifying marks was used to prevent students from bringing unauthorized notes into the exam room.  Given the lack of "official" paper, Levy made markings on blank paper to create impromptu scrap paper.  Blum was then provided with this scrap paper and the exam materials.  Levy recalled giving Blum only three sheets of the impromptu scrap paper.  Blum contends that she received four sheets of paper: one sheet of the "official" scrap paper along with three sheets of the impromptu scrap paper created by Levy.  (Id. at ¶¶ 26, 30-35, 38.)

Blum asserts that, upon receiving the exam, she immediately used the one sheet of "official" scrap paper to engage in "mind dumping," a technique in which students immediately write down a number of pieces of information that they believe will be covered on an exam.  Approximately an hour later, Levy entered the test-taking room and informed Blum that he believed she was using an unauthorized "cheat sheet."  Specifically, Levy pointed out that Blum had notes on a sheet of the "official" scrap paper, which had been folded several times and had not been provided by him.  Levy thus concluded that Blum had somehow obtained a sheet of "official" scrap paper prior to the exam, had written notes to create a "cheat sheet" and had brought the "cheat sheet" into the WLRC.  (Id. at ¶¶ 36, 38-39.)

Employees of Penn's Office of Student Conduct ("OSC") later contacted Blum as part of an investigation into what happened during the exam. The OSC is tasked with enforcing Penn's rules and regulations concerning the behavior of students. The OSC also administers disciplinary hearings, which are governed by a series of rules set forth in the Charter of the University of Pennsylvania Student Disciplinary System ("the Charter"). On May 20, 2011, after two meetings between Blum and OSC representatives, the OSC issued a "charge letter," charging Blum with a violation of Penn's Code of Academic Integrity due to the use of an unauthorized study aid. (Id. at ¶¶ 43-45, 47, 51, 53.)

The OSC subsequently scheduled a disciplinary hearing. Blum requested accommodations for the hearing, including the right to submit a written statement to the disciplinary hearing panel, the opportunity to take breaks to relieve anxiety and the physical manifestations of her conditions and the use of an outside attorney to represent her during the hearing. These requests were refused by Penn. Although Penn eventually agreed to postpone the hearing to a date that was agreeable to Blum, it continued to refuse her the accommodations she requested. The OSC later scheduled the hearing for January 24, 2012. (Id. at ¶¶ 59, 67, 69, 80-82.)

On January 20, 2012, Blum filed a suit in this Court, alleging that: (1) Penn refused to offer her reasonable accommodations in the disciplinary process in violation of the Americans with Disabilities Act and § 504 of the Rehabilitation Act; (2) Penn was liable for intentional infliction of emotional distress because it denied her fair and equal access to the disciplinary process and caused her severe distress; and (3) Penn had applied its disciplinary process to her in a manner that was fundamentally unfair. Blum raised this last claim even though the hearing had not yet taken place. Blum asserted that Penn's refusal to provide her with accommodations

would prevent her from meaningfully participating in the future hearing. Blum also concurrently filed a Motion for Temporary Restraining Order and Preliminary Injunction. In her motion, Blum requested that Penn be enjoined from proceeding with the disciplinary hearing until the requested accommodations were provided.

A hearing before this Court was scheduled on January 23, 2012. Following extensive settlement negotiations, the parties agreed to a settlement, which was placed on the record and confirmed by counsel for the parties. The following settlement terms were reached:

1.   The disciplinary hearing would be rescheduled;

2.   The OSC presenter would not directly question Blum, but could suggest questions to the hearing panel;

3.   The OSC presenter, Blum, Blum's advisor and the hearing panel could question Penn's witnesses (the advisor's questioning would be subject to the final determination of the Disciplinary Hearing Officer ("DHO"));

4.   The direct examination would be structured to bring out the facts rather than "prosecutorial harangue."[1] After further discussion, the parties agreed that the disciplinary hearing would not be "a[n] overly adversarial litigation type experience," but rather a "fact-finding mission" and that "everyone involved [would] treat it accordingly";

5.   Blum could question Penn's witnesses subject only to the DHO's direction;

6.   The DHO would determine Blum's advisor's "expanded role" at the hearing;

7.   The panel could ask questions of any witness;

8.   The federal lawsuit would be dismissed with prejudice "unless [this agreement is] substantially breach[ed] in [the Court's] judgment";

---

[1]   The term "prosecutorial harangue" was chosen by Penn's counsel and assented to by both parties. Having the benefit of hindsight, we regret that we did not require the parties to articulate a more clear definition for this term. However, the subsequent clarification of the settlement terms, which specified that the hearing would not be "a[n] overly adversarial litigation type experience," but rather a "fact-finding mission" helps to shed light on the parties' intent.

9.     "No fees or costs [would] be assessed in any event unless there's a breach of an agreement";

10.    Blum's parents would be permitted in the hearing room;

11.    Blum would be permitted to have notes at the hearing;

12.    "[A]ffidavits will be permitted as they are under the [C]harter rules";

13.    Penn would limit the number of people in the hearing room.

(See TRO Hr'g Tr. Jan. 23, 2012, pp. 37-50.) Pursuant to this settlement, on January 25, 2012, an order of dismissal was entered under Local Rule 41.1(b).

Blum's disciplinary hearing was held on February 28, 2012 and was presided over by Dr. Paul Sniegowski, who served as the Disciplinary Hearing Officer. The OSC's case was presented by Melinda deLisle. Blum was accompanied by two advisors, and her parents were permitted in the room. After the presentation of evidence and statements, the five-member panel hearing the case found Blum responsible for violating Penn's Code of Academic Integrity, and recommended that she receive a "letter of warning" as a sanction.

On April 6, 2012, Blum timely appealed the panel's findings to the Disciplinary Appellate Officer ("DAO") (a faculty member appointed on a rotating basis).[2] In a letter dated May 2, 2012, the DAO ruled against Blum in all respects.

On July 26, 2012, Blum filed the instant motion to vacate dismissal and reinstate her complaint, arguing that the settlement agreement reached on January 23, 2012 had been substantially breached. Oral argument was held on this motion on December 18, 2012. The parties subsequently filed supplemental submissions. The matter is now ripe for disposition.

---

[2] Meanwhile, Blum moved this Court for an order extending its jurisdiction for an additional ninety days. That motion was granted on April 27, 2012.

## II.    LEGAL STANDARD

Local Rule 41.1(b) provides that an order of dismissal "may be vacated, modified, or stricken from the record, for cause shown, upon the application of any party served within ninety (90) days of the entry of such order of dismissal."

Where, as here, dismissal was predicated on substantial performance of a settlement agreement, we must determine whether there was a material breach of the contract.[3] "For a breach to be material, it must go to the essence of the contract." Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008). Pennsylvania courts look to the following factors to determine materiality:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

See Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012) (citing RESTATEMENT (SECOND) OF CONTRACTS § 241)).

---

[3] As discussed in Section III.A.8, infra, the parties agreed that the case would be dismissed unless there was a "substantial" breach of the settlement agreement. Because the terms "substantial" and "material" are inherently similar, we use these terms interchangeably.

"If the nonperforming party has substantially performed its obligations under the contract, then the nonperformance is not considered to be material." Sabatini v. Its Amore Corp., 455 Fed. Appx. 251, 256 (3d Cir. 2011). In other words, "mere technical, inadvertent, or unimportant omissions or defects" are insufficient to show material breach. Fort Washington Resources, Inc. v. Tannen, 901 F. Supp. 932, 940 (E.D. Pa. 1995).

## III.    DISCUSSION

Blum contends that there is good cause to vacate the dismissal of this action because Penn "breached the settlement agreement between the parties, by holding a disciplinary hearing that was not at all in accordance with either the spirit or the letter of that agreement." (Pl.'s Br. 4.) Blum asserts sixteen specific instances where the settlement agreement was allegedly breached. Five of these occurrences pertain to express provisions of the settlement agreement and the remainder relate to the overall fairness of the hearing. We begin our analysis with a determination of whether the alleged violations of express provisions were material breaches, and then move to Blum's allegations of unfairness.

### A.    Did Penn Substantially Breach The Settlement Agreement By Allowing deLisle To Directly Question Blum?

Blum first argues that Penn violated an express provision of the settlement agreement because OSC's presenter, Melinda deLisle, directly questioned her. This term of the settlement agreement was reached as an accommodation for Blum's severe anxiety in confrontational public speaking settings. Blum asserts that deLisle's questioning was a substantial breach as it raised her anxiety and hurt her efforts to effectively present her case. (Pl.'s Br. 29-30.)

Blum originally pointed to five instances of direct questioning by deLisle. (Id. at 29.) However, after reviewing the excerpts of the hearing's recording provided by Penn,[4] Blum filed an affidavit indicating her belief that deLisle was the questioner in only one of the five instances. This particular question was posed on page 189 of the disciplinary hearing transcript and states: "So what do you do with your dumping sheets?" (See Blum Aff. ¶¶ 4-7, Doc. No. 26; Disciplinary Hr'g Tr. p. 189, Def.'s Br., Ex. G.)

Penn responds that the transcript improperly attributed this question to deLisle. In support, Penn attached a declaration from deLisle, stating that she was not the speaker nor was there any other instance in which she directly questioned Blum. (See Def.'s Resp., Ex. N.) In addition, Penn filed a declaration from hearing panel member Nancy J. Kirschmann, which states that she was in fact the speaker at page 189. (Kirschmann Decl. ¶¶ 5-6, Doc. No. 29.)

Resolving the issue of who actually questioned Blum at page 189 could involve a separate hearing before this Court and credibility determinations. However, resolution of this disputed fact is unnecessary to the disposition of the motion before us. Even assuming that deLisle questioned Blum, a single nine-word question during the course of a six-and-a-half-hour proceeding simply does not amount to a substantial breach of the settlement agreement. Although we sympathize that Blum suffers from multiple psychological disorders, the purpose of preventing direct questions was to minimize her anxiety so that she could meaningfully participate in the hearing. A minor and benign violation by deLisle, even if that did occur, did not deprive Blum of this benefit.

---

[4] We note that Penn used a recording device to tape the disciplinary hearing. The recording was then transcribed by a court reporting service to create the transcript cited to by the parties.

Review of the recording excerpts has also caused Blum to believe that deLisle questioned her on additional occasions that were not reflected in the transcript. According to Blum, the omission of these alleged questions renders the entire transcript recording unreliable. (See Blum Aff. ¶¶ 8-9.) However, Blum neglects to acknowledge that Penn provided her with an opportunity to listen to the recording of the hearing and to determine if, in fact, there were other occasions in which she was directly questioned by deLisle. Blum chose not to listen to the recording, and instead demanded that she be given an electronic copy of the recording. Although Blum contends that Penn's refusal to provide her with an electronic copy violated federal law, that issue is separate from the one before us.

**B.    Did Penn Substantially Breach The Settlement Agreement By Moving Forward With The Hearing Despite The Fact That The Panel Had Further Questions For The Course Professor, Dr. Neta Zach?**

Blum next argues that Penn breached the settlement agreement because the DHO prevented the panel from asking the course professor, Dr. Neta Zach, two follow-up questions. (Pl.'s Br. 23-25.) During their deliberations, the panel requested the following additional pieces of evidence from Zach: (1) whether Blum used the mind dumping technique on the midterm exam and, if so, whether that scrap paper was kept; and (2) why Zach did not respond to Blum after the incident. (Disciplinary Hr'g Tr. pp. 194-96.) At the time these questions were raised, Zach was no longer present at the hearing. Nevertheless, the DHO allowed the panel members to attempt to reach her. Prior to these attempts, the DHO stated on the record that he had spoken with the panel, the OSC, Blum, her advisors and her parents, and that everyone agreed that the hearing would move forward if Zach could not be reached. After several failed attempts, the DHO again asked if everyone was okay with proceeding. No objection to proceeding is noted in

the transcript nor does Blum argue that she raised such an objection. (Disciplinary Hr'g Tr. pp. 194, 197-99.)

Blum asserts that the DHO's actions violated the settlement agreement, and deprived her of a fair hearing. Blum makes this assertion because she claims the panel members were not "fully informed and [had not] satisfied themselves of everything that they need[ed] to reach a decision." (Pl.'s Br. 23-25.) Penn responds that Zach's answers to the panel's follow-up questions would not have changed the outcome of the hearing. Penn also asserts that Blum and her parents agreed that the case should proceed despite the panel's inability to locate Zach. (See Def.'s Resp. 13-14.)

We again find that Blum has failed to show a material breach of the settlement agreement. Blum does not argue that Penn actively prohibited questioning of Zach in contravention of the third and seventh terms of the settlement agreement (providing that the panel could question witnesses). Indeed, Blum does not dispute that the panel had the opportunity to fully ask questions of Zach and did ask such questions. (See Disciplinary Hr'g Tr. pp. 48-68.) Blum also does not dispute that the panel had the opportunity to question other witnesses. Rather, she takes issue with the DHO's decision to move forward with the proceeding after the panel members raised two questions for Zach when she was no longer in the hearing room.

As noted above, before the attempts to locate Zach were made, Blum and her parents agreed that the hearing would proceed if Zach could not be reached. Following the failed attempts, the DHO asked everyone (the OSC, panel members, Blum, her advisors and parents) if they were okay with proceeding to closing statements. The hearing record reflects that everyone

was in agreement, and Blum does not argue to the contrary.  We cannot, therefore, conclude that the DHO's actions are a substantial breach of the settlement agreement.

>    **C.**    **Did Penn Substantially Breach The Settlement Agreement When deLisle Commented On Certain Evidence, Including Blum's Affidavits?**

Blum next asserts that deLisle made improper comments in violation of the "prosecutorial harangue" and "affidavit" terms of the settlement agreement.  Blum argues that certain comments made by deLisle were "positively prosecutorial," which Penn expressly agreed to avoid.  For instance, Blum cites to deLisle's comment during closing statements that "pretty much any student that comes into my office having done anything says they're not the kind of person that would do this sort of thing."  (Pl.'s Br. 16-17.)  Blum also argues that deLisle engaged in prosecutorial-type conduct when she attacked the affidavits Blum submitted on the basis that the affiants were not present at the hearing and had been paid.  Moreover, Blum contends that Penn's failure to completely answer her request for access to her files was not in keeping with its agreement to conduct a hearing that was free of "prosecutorial harangue" and designed to bring out the truth.  (Id. at 16, 25-26.)

Penn counters that the settlement did not include an agreement that the proceeding would lack adversarial character, but that it would not be "overly" adversarial.  As such, Penn argues that there was no substantial breach because deLisle's acts were not overly prosecutorial or overly adversarial in nature.  Penn further contends that nothing in the settlement agreement obliged it to accept the truth of the affidavits that Blum presented, or prohibited deLisle from commenting on the affidavits.  Lastly, Penn asserts that it complied with its obligations to turn over documents pursuant to the Charter, and that the file documents referenced by Blum contained nothing relevant to the issue of whether Blum cheated.  (Def.'s Br. 8-9, 14-15; Oral Arg. Tr. Dec. 18, 2012, at pp. 26, 54.)

After careful consideration, we find that deLisle's actions do not constitute a substantial breach of the settlement agreement. A review of the disciplinary hearing transcript demonstrates that, as a whole, deLisle's actions were not overly adversarial, but were instead predominantly fact finding in nature. During each witness' testimony, deLisle allowed the witness to present his or her story in narrative form before asking any questions. Additionally, the questions she did ask were designed to elicit relevant factual information, and were, for the most part, roughly equal in number to the questions asked by the panel members. (See, e.g., Disciplinary Hr'g Tr., pp. 38-111.)

Further, the specific comments with which Blum takes issue simply do not amount to a material breach. While there were a few occasions in deLisle's opening and closing where she commented on Blum's intent before and after the developmental neurobiology exam, such comments were short in duration and were in no way overly adversarial. (See Disciplinary Hr'g Tr., pp. 18:10-12, 202: 20-21, 203:8-15.) In addition, the settlement agreement did not require that deLisle refrain from taking a position or presenting her version of the case. In fact, Blum acknowledges that Penn in no way abandoned its right to present opening and closing statements during the hearing. (See Oral Arg. Tr. 55-56.)

deLisle's attacks on the affiant's credibility based on their absence and compensation was also not overly adversarial, but rather amounted to fair inferences and arguments. (See id. at pp. 28:7-12, 28:19-22 204:5-9, 204:17-22, 205:23-206:1.) These comments were not long, and together likely constituted at most a minute or two of a six-and-a-half-hour proceeding. Moreover, that deLisle did not accept the truth of the affidavits does not render Penn in non-compliance with that term of the settlement agreement.

In sum, because the overall tenor of the hearing appears to have been fact finding in nature, and because Blum was permitted to present affidavits at the hearing, we conclude that Penn substantially complied with the relevant provisions of the agreement. In reaching this conclusion, we note that Blum received the benefits that she reasonably expected from the settlement—a reduction of her anxiety and the ability to meaningfully participate in the hearing. Indeed, a review of the hearing transcript demonstrates that Blum ably presented her position. The unfavorable outcome of the hearing does not vitiate these benefits.

### D. Was An Implied Term Of The Settlement Agreement That Penn Would Conduct A Fair Disciplinary Hearing?

Lastly, Blum contends that the dismissal order should be vacated because Penn breached the settlement agreement by conducting the disciplinary hearing in a manner that was "fundamentally unfair." (Pl.'s Br. 7.) Penn counters that the fairness of the hearing was not a term of the parties' settlement agreement, and, in any event, the disciplinary process satisfied the requirements of fundamental fairness. (Def.'s Resp. 6; Def.'s Supp. Resp. 2-3.)

While Blum concedes that fairness was not an express term of the settlement agreement, she argues that it was an implicit provision. (Pl.'s Supp. Br. 4.) She asserts that, among other things, Penn evaded the spirit of the bargain by deviating from its Charter in administering the disciplinary hearing; interfered with her attempt to perform the settlement agreement; and deprived her of the right to receive the "fruits of the settlement agreement, the ultimate goal of which was to provide her with a fair hearing." Blum asserts that this Court is bound to construe the fairness of the hearing under Pennsylvania's implied covenant of good faith and fair dealing and the related doctrine of necessary implication. (Id. at 2-5.)

Under Pennsylvania law, "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." Cave v. Saxon Mortg. Servs., Inc.,

2012 WL 1957588, at *8 (E.D. Pa. May 30, 2012) (quoting Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716, 722 (Pa. Super. Ct. 1996)); see also RESTATEMENT (SECOND) OF CONTRACTS § 205; Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F. Supp. 2d 416, 425 (E.D. Pa. 2011) (noting that the "recent trend of adoption of Section 205 [of the Restatement (Second) of Contracts] in the Pennsylvania intermediate appellate courts constitutes strong corroboratory evidence that the Pennsylvania Supreme Court would adopt Section 205").  Bad faith includes "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  Cave, 2012 WL 1957588, at *8 (quoting Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)).

Pennsylvania courts also recognize the doctrine of necessary implication, which provides that:

> [i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the party's right to receive the fruits of the contract.

Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 434 n.11 (Pa. 2001) (quoting Slater v. Pearle Vision Ctr., 546 A.2d 676, 679 (Pa. Super. Ct. 1988)).  A court may imply a missing term from a contract "only when it is necessary to prevent injustice and it is abundantly clear that the parties intended to be bound by such term."  Melton v. Melton, 831 A.2d 646, 654 (Pa. Super. Ct. 2003) (quoting Kaplan, 671 A.2d at 720).

As in any contract-related dispute, the court's goal when interpreting a contract is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their agreement.  O'Brien Energy Systems, Inc. v. American Employers' Ins. Co., 629 A.2d 957,

960 (Pa. Super. Ct. 1993). In making this determination, the court looks to what the parties have clearly expressed, as the law does not assume that the language of the contract was chosen carelessly. See Meeting House Lane, Ltd. v. Melso, 628 A.2d 854, 857 (Pa. Super. Ct. 1993).

In considering Blum's claim that the settlement agreement was breached because the hearing was fundamentally unfair, it is instructive to recall why Blum filed a federal lawsuit in the first place, and the relief sought therein. The crux of Blum's concerns centered around Penn's refusal to provide her with reasonable accommodations so that she could participate, regardless of her disabilities, in the disciplinary process. As such, the terms of the settlement agreement were reached to specifically address Blum's disability-related concerns. These terms did not include allowing the Court to maintain jurisdiction to review whether Penn substantially complied with its Charter or whether the hearing was fundamentally fair. Blum's counsel could have suggested that such terms be placed on the settlement record, but did not do so. Nonetheless, even if the fairness of the hearing was an implicit, unspoken term of the settlement agreement, consideration of Blum's fairness claims reflect that she has not demonstrated cause to warrant vacatur of the order of dismissal.

Blum alleges the following fairness claims: (1) the DHO improperly instructed the hearing panel on the proper evidentiary standard; (2) the panel did not apply the proper evidentiary standard; (3) Levy's testimony was not clear and convincing evidence; (4) Penn improperly stigmatized Blum before the hearing even began and the DHO refused to rectify this problem upon request; (5) Penn violated Blum's civil rights by denying her access to her educational records prior to the hearing; (6) Penn used some of the withheld documents at the hearing; (7) Penn improperly used evidence (a floor plan) that it did not give to Blum in advance of the hearing; (8) the OSC improperly changed its evidence against Blum just before the

hearing, without the notice to Blum that the Charter requires; (9) following the hearing panel's ruling, Penn actively frustrated Blum's efforts to appeal the decision internally; and (10) the DAO's ruling on appeal is perfunctory and merely ratifies all of Penn's behavior without detailed examination. We address each claim in turn.

Regarding her first fairness claim, Blum contends that the DHO did not properly articulate the "true definition" of clear and convincing evidence, the standard set forth in the Charter. Blum asserts that, because the Charter does not define the evidentiary burden, it must necessarily carry its definition under Pennsylvania law. (Pl.'s Br. 8-9.) This argument ignores the fact that Penn has a Disciplinary Hearing Protocol, which defines clear and convincing proof. (See Def.'s Resp., Ex. F.) Although the Charter does not appear to refer to the Protocol, Blum has failed to provide any evidence, beyond mere speculation, that the definition differs among hearings. Blum has also failed to show that the definition set forth was fundamentally unfair. Indeed, Penn is not required to adopt Pennsylvania's precise definition of clear and convincing proof; it must simply provide a fundamentally fair standard, adequate notice and compliance therewith. See Boehm v. Univ. of Pa. Sch. of Veterinary Med., 573 A.2d 575, 580 (Pa. Super. Ct. 1990) (noting that courts "have held generally that disciplinary acts by private colleges or universities will be upheld so long as the proceedings have been fundamentally fair and the school has not deviated substantially from the procedures established by the school").

With respect to Blum's second and third fairness claims, the panel's application of the evidentiary standard and the sufficiency of the evidence presented by the OSC do not implicate Penn's obligation to follow its Charter or affect the fundamental fairness of the hearing. In short, Blum effectively requests that this Court act in an appellate capacity. The parties' settlement did

not contemplate such a substantive review, nor does the law provide for it.  See Boehm, 573 A.2d at 580.

Regarding her fourth fairness claim, Blum does not argue that Penn violated its Charter, but asserts that including her academic status in the Disciplinary Hearing Protocol was unfair. Blum contends that the Charter does not mandate this practice and that the DHO's refusal to remove the designation from the Protocol was prejudicial.  (Pl.'s Br. 17-18.)  However, Blum has failed to show how this practice is prejudicial or fundamentally unfair.  Indeed, Blum has not provided any evidence beyond mere speculation that she was prejudiced by this practice. Moreover, Blum ignores the fact that the DHO indicated by email that she could clarify her status at the hearing if she requested to do so.  (Def.'s Br., Ex. J.)  Even though Blum has shown that she sent a follow-up email with such request, she has not indicated that she attempted to explain her status at the hearing but was prohibited from doing so.

Blum's fifth through seventh claims pertain to Penn's obligation to exchange evidence. The Charter requires that the parties must "exchange . . . copies of all exhibits to be presented, the names of witnesses to be called, and a brief summary of the substance of testimony expected to be presented to the Hearing Panel." (Id., Ex. L at II.F.3.a.)

Blum first contends that Penn denied her access to certain records prior to the hearing in violation of the Family Educational Rights and Privacy Act of 1974 ("FERPA").   Specifically, Blum asserts that she received the following documents just days after the hearing: (1) an email from Lyn Davis, a former OSC representative, to deLisle suggesting that deLisle remove five items from Blum's file before Blum could review it; and (2) a series of emails between OSC employees, the DHO and Zach, which allegedly suggest that Zach may have been coerced or pressured into bringing the charges.  Blum argues that Penn's agents conspired to withhold these

documents prior to the hearing in an effort to deprive her of the benefit of "various defenses." Blum further asserts that Penn refused to turn over Davis' findings and investigative "report," which Blum requested under FERPA. Although Penn has indicated that Davis never prepared a report, Blum claims that information in the Davis "report" was referred to at the hearing. Lastly, Blum argues that she was repeatedly denied a floor plan of the exam room as part of the pre-hearing exchanges, and that, in spite of this, Levy was permitted to use a floor plan to aid in his testimony. (Pl.'s Br. 18-23, 27.)

We initially note that Penn's obligations under the Charter are distinct from its obligations under FERPA. Because the latter is not an issue before us, we will not opine as to whether Penn was in compliance with that law. Further, we find that Blum has failed to show that the OSC's omission of the emails discussed above violated Penn's obligations under the Charter. The Charter does not provide for the same discovery obligations required in a criminal matter, nor is Penn required to produce such discovery to render the disciplinary process fundamentally fair. Blum has also not shown how the late exchange of any documents prejudiced her. Indeed, she has not argued that the documents included any evidence to contradict the testimony of Penn's witnesses. Neither does deLisle's reference to Davis' notes and/or findings constitute a violation of the Charter. The Charter does not mandate that the OSC turn over all of its notes and findings, and Blum has not shown that failing to produce such information rises to the level of fundamental unfairness.

We further conclude that Levy's use of a floor plan during his testimony is at most a de minimis breach of the Charter, if at all. Blum does not contend that Penn failed to turn over other exhibits or withheld the names of the witnesses that it intended to present at the hearing. Therefore, regardless of whether Levy or the OSC brought the floor plan to the hearing—a fact

18

that the parties dispute—Penn was in substantial compliance with its pre-hearing exchange obligation. Moreover, Blum provides no explanation for why Levy's use of a demonstrative aid prejudiced her. She does not argue that the floor plan was misleading or that she needed to reschedule the hearing to review the drawing.

With respect to the eighth fairness claim, Blum contends that Penn violated the Charter by improperly changing its evidence against her without proper notice. Specifically, Blum contends that the summary of Zach's statement as presented in the charge letter was "just the opposite" of Zach's testimony at the hearing. (Id. at 28-29.) Although Blum provides no citation to the Charter, it appears that her argument is again grounded in a violation of the Charter's pre-hearing exchange obligation. As discussed above, the Charter does not require that the OSC provide a student with every word of a witness' anticipated testimony. Instead, the Charter mandates that the OSC turn over a "brief summary of the substance of testimony expected to be presented." (Def.'s Br., Ex. L at II.F.3.a.)

The charge letter indicates that Zach examined the notes on the purported "cheat sheet" and found "that these notes did not look like answer relevant notes that would have been written during the examination in response to the actual, specific examination questions that [Blum] would have had in front of her in the examination room." (See id., Ex. C.) Contrary to Blum's contention, Zach's testimony at the hearing was not "just the opposite," but rather, was consistent with the evidence presented in the charge letter. The evidence of the charge letter was therefore not a "false" summary. Accordingly, we find that Blum's eighth fairness claim does not demonstrate a material breach of the Charter.[5]

---

[5] We note that Blum also contends that the OSC falsely summarized what the testimony of other witnesses would be. (See Pl.'s Br. 29.) Blum provides no evidence in support of this contention, and thus it is insufficient to show breach of the Charter.

In her ninth fairness claim, Blum contends that Penn frustrated her internal appeal by refusing to provide her with an electronic copy of the disciplinary hearing recording. (Id. at 30-31.) The Charter states that "[t]he OSC will arrange for a verbatim transcript or recording to be made of all disciplinary hearings." (Def.'s Resp., Ex. L at II.F.4.h.) Penn complied with this provision by arranging for both a recording and a transcript of the proceeding. In addition, Penn provided Blum with a copy of the transcript, as well as the opportunity to listen to the recording. Despite Blum's contention that the transcript is "riddled with errors, unidentified speakers, and other problems," she did not avail herself of the opportunity to listen to the recording. The fact that she would be inconvenienced to travel to Philadelphia to listen to the recording because she currently resides in California does not render Penn in violation of its Charter. Indeed, the Charter does not require Penn to provide a student with an electronic copy of the recording.

Finally, in her tenth fairness claim, Blum takes issue with the DAO's ruling upholding the panel's findings. (Id. at 31-34.) We again conclude that Blum has failed to demonstrate a breach of the Charter or fundamental unfairness in the DAO's opinion. Blum has pointed to no provisions of the Charter that the DAO violated. Further, her contention that the DAO's impartiality must be called into "serious question" given that he accepted Penn's actions, and her concern as to "whether [the DAO] wrote his ruling with the assistance of counsel" is not supported by any evidence.[6]

---

[6] We note that the parties have not expressly stated their positions with respect to the ninth term of the settlement agreement: the assessment of fees and costs. Regardless, we find that fees and costs are not warranted under the circumstances.

**IV.     CONCLUSION**

In sum, we find that Blum has failed to show substantial breach of the settlement agreement.  Therefore, we conclude that there is not sufficient cause to warrant vacatur of the order of dismissal, and Blum's motion will be denied.

An appropriate Order follows.